James E. TALLEY, Appellant,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, Appellee.

Aundes F. COLLINS, Appellant,

United Mine Workers of America, Amicus Curiae,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, Appellee.

Sidney G. ADAMS, Appellant,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, Appellee.

Otis R. TAYLOR, Appellant,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, Appellee.

Nos. 75–2255 to 75–2258.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1976.

Decided Jan. 5, 1977.

S. Strother Smith, III, Abingdon, Va. (Robert Austin Vinyard, William H. Robinson, Smith, Robinson & Vinyard, Abingdon, Va., on brief), for appellants.

E. Gail Falk, Charleston, W. Va., for United Mine Workers of America as amicus curiae.

Frederick D. Cohen, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., Paul R. Thomson, Jr., Roanoke, Va., U. S. Atty., and William Kanter, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before RUSSELL, FIELD and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

These consolidated appeals raise an administrative jurisdictional issue of some consequence under the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901 et seq. (hereafter the Act).

Plaintiffs are former coal miners who submitted applications for black lung benefits to the Social Security Administration prior to July 1, 1973.[1] Each, however, continued to work in the mines subsequent to July 1st.[2] The issue is whether plaintiffs "filed" their claims within the meaning of the Act prior to July 1, 1973, as is required to invoke the jurisdiction of the Secretary of Health, Education and Welfare (hereafter the Secretary), and consequently to take advantage of more liberal adjudicatory standards established by the Department of Health, Education and Welfare (HEW) regulations.

The Secretary administers only those black lung claims over which the federal government assumes sole responsibility for the payment of benefits. The following statutory sections, read in conjunction, define such claims in terms of when they must be filed:

30 U.S.C. § 924(a)(1): "No claim for benefits under this part [Sub ch. IV, part B] on account of total disability of a miner shall be considered unless it is *filed* on or before December 31, 1973 . . . ." (emphasis added).

30 U.S.C. § 924(b): "No benefits shall be paid under this part [Sub ch. IV, part B] after December 31, 1973, if the claim therefor was *filed* after June 30, 1973." (emphasis added).

Thus, as will be discussed in more detail below, the federal government, under the jurisdiction of the Secretary of HEW, pays black lung benefits to claimants who file their claims on or before June 30, 1973. But as crucial to the statutory scheme as the word *file* is, nowhere in the Act is it defined.

Plaintiffs contend that to file is simply to submit appropriate forms in connection with a claim for benefits; the Secretary's position, sustained by the district court, is that under 20 CFR § 440.226(b) one does not "effectively file [. . .]" a claim until the first month in which all requirements for entitlement to benefits are met. For reasons set forth in this opinion, we conclude that the Secretary's position is in accord with neither the language of the statute nor the intent of Congress, and we vacate the judgment of the district court.

I

The provisions of Title IV of the Federal Coal Mine Health and Safety Act of 1969,

[1] Aundes Collins submitted his claim in 1970; Sidney Adams on February 22, 1971; Otis Taylor on May 2, 1970; James Talley on May 25, 1970.

[2] See part II of this opinion. The record reveals that Collins was still employed in light, outside mining work as of March 7, 1975. Adams ceased employment on April 20, 1974; Taylor on December 31, 1973; and Talley on October 31, 1973.

as amended by the Black Lung Benefits Act of 1972, reveal the significance of the issue under consideration in this case. The Act provided a means of assuring federal benefits to the considerable number of coal miners totally disabled by chronic lung disease as a result of their employment, but who were inadequately compensated under State law. 30 U.S.C. § 901; *see generally* Statement of House Managers, Conf.Rep. No. 91–761, 91st Cong., 1st Sess. (1969), 1969 U.S.Code Cong. and Admin.News, p. 2578 at 2603. It essentially required a claimant for disability benefits to establish (1) that he was totally disabled within the meaning of HEW regulations to be promulgated; (2) that his disability was due to pneumoconiosis (black lung disease); and (3) that such disability arose out of employment in the nation's coal mines.[3] A series of statutory presumptions was enacted to facilitate proof of the above eligibility criteria.[4]

Jurisdiction for administering claims for benefits was divided between the Secretary of Labor and the Secretary of Health, Education, and Welfare, and such dual administration continues under the amended Act. Generally, the Secretary of Health, Education, and Welfare administers claims under Part B of Title IV, 30 U.S.C. §§ 921–925, those filed on or before December 31, 1973;

---

**3.** 30 U.S.C. § 921(a) reads:

"(a) The Secretary shall, in accordance with the provisions of this part, and the regulations promulgated by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis, and in respect of the death of any miner whose death was due to pneumoconiosis or who at the time of his death was totally disabled by pneumoconiosis." The 1972 amendments added the clause, "or who at the time of his death was totally disabled by pneumoconiosis."

Subsection (b) is in pertinent part:

"(b) The Secretary shall by regulation prescribe standards for determining for purposes of subsection (a) of this section whether a miner is totally disabled due to pneumoconiosis and for determining whether the death of a miner was due to pneumoconiosis."

Also bearing on the definition of total disability is 30 U.S.C. § 902(f):

"(f) The term 'total disability' has the meaning given it by regulations of the Secretary of Health, Education, and Welfare, except that such regulations shall provide that a miner shall be considered totally disabled when pneumoconiosis prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time. Such regulations shall not provide more restrictive criteria than those applicable under section 423(d) of Title 42."

30 U.S.C. § 902(d) as amended defines "miner" as any individual who is or was employed in a coal mine.

**4.** 30 U.S.C. § 921(c):

"(c) For purposes of this section—

(1) if a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment;

(2) If a deceased miner was employed for ten years or more in one or more coal mines and died from a respirable disease there shall be a rebuttable presumption that his death was due to pneumoconiosis;

(3) if a miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be in a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B), then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis, as the case may be."

The 1972 amendments left these presumptions intact. Eliminated was a requirement in 30 U.S.C. § 902(d) that the claimant have been employed in an underground coal mine, and added was the presumption of total disability at the time of death found in subsection (3). In addition, a fourth presumption was enacted. See § 921(c)(4), infra, note 11.

In *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Supreme Court sustained the constitutionality of the various rebuttable and irrebuttable presumptions listed above against the claim that such presumptions facially violated the due process clause of the Fifth Amendment.

It should be noted that each of the plaintiffs had been employed more than 15 years in the mines, thus each was entitled to the benefit of all otherwise applicable presumptions.

and the Secretary of Labor administers claims under Part C, 30 U.S.C. §§ 931, 941, those filed after December 31, 1973. See 30 U.S.C. § 902(c).[5] Under the Act as amended in 1972, however, jurisdiction is conferred on the Secretary of Labor over a class of interim Part B claims filed between July 1, 1973 and December 31, 1973. 30 U.S.C. § 925(a)(1).[6]

The Senate Report indicates Congress was dissatisfied with the results obtained under the statute as originally enacted. See S.Rep. No. 92–743, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. and Admin. News, p. 2307 et seq. It was felt that many miners and survivors of miners for whose benefit the Act had been passed were failing to qualify for benefits under applicable standards. In response to this situation, Congress amended the Act in 1972 in order to facilitate the ability of claimants to qualify for black lung benefits.

While the 1972 amendments left intact the basic thrust of the Act, some significant changes were made. First, the amendments extended the period of federal responsibility for the payment of black lung benefits.[7] Under Part C of the amended Act, encompassing claims filed after December 31, 1973, benefits are considered the responsibility of the coal industry. They are paid under applicable State workmen's compensation laws, provided that such laws are deemed to offer adequate coverage for black lung disability, 30 U.S.C. § 931(a),[8] or, if not, through self-insurance programs. 30 U.S.C. § 933(a).[9] The federal government assumes responsibility for the payment of benefits arising out of certain Part B claims, filed on or before June 30, 1973. Federal coverage extends only to the end of 1973 for claims filed in the interim period between June 30th and December 31st of that year. 30 U.S.C. § 924(a)(1), (b).[10] Re-

5. 30 U.S.C. § 902(c):
"The term 'Secretary' where used in part B means the Secretary of Health, Education, and Welfare, and where used in part C means the Secretary of Labor."

6. 30 U.S.C. § 925:
"(a) Notwithstanding any other provision in this subchapter, for the purpose of assuring the uninterrupted receipt of benefits by claimants at such time as responsibility for administration of the benefits program is assumed by either a State workmen's compensation agency or the Secretary of Labor, any claim for benefits under this part filed during the period from July 1, 1973 to December 31, 1973, shall be considered and determined in accordance with the procedures of this section. With respect to any such claim—
(1) Such claim shall be determined and, where appropriate under this part or section 934 of this title, benefits shall be paid with respect to such claim by the Secretary of Labor."

7. From the time of its enactment, the Act contemplated that responsibility for the payment of black lung benefits was ultimately to be borne by the coal industry. The role of the federal government was to be limited to the existing backlog of cases. See S.Rep. No. 92–743, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. and Admin.News at 2323, 2324.
Under the 1969 Act, responsibility for the administration of claims was to shift from the federal government to the coal industry on January 1, 1973. To ease the transition, all claims filed after December 31, 1971 would be paid by the federal government until the end of 1972. Thereafter, such claims would be paid by the industry. See 30 U.S.C. § 924(a), (b), and the amendment.

8. 30 U.S.C. § 931(a):
"On and after January 1, 1974, any claim for benefits for death or total disability due to pneumoconiosis shall be filed pursuant to the applicable State workmen's compensation law, except that during any period when miners . . . are not covered by a State workmen's compensation law which provides adequate coverage for pneumoconiosis they shall be entitled to claim benefits under this part."

9. 30 U.S.C. § 933(a):
"During any period in which a State workmen's compensation law is not included on the list published by the Secretary under section 931(b) of this title each operator of a coal mine in such State shall secure the payment of benefits for which he is liable under section 932 of this title by (1) qualifying as a self-insurer in accordance with regulations prescribed by the Secretary . . . ."

10. 30 U.S.C. § 924(a)(1):
"(a)(1) No claim for benefits under this part on account of total disability of a miner shall be considered unless it is filed on or before December 31, 1973, or in the case of a claimant who is a widow, within six months after the death of her husband or by December 31, 1973, whichever is the later."
Section 924(b):
"No benefits shall be paid under this part after December 31, 1973, if the claim therefor was filed after June 30, 1973."

sponsibility is upon the coal industry for the payment of benefits with respect to such claims after December 31, 1973.

In addition to altering the transition dates from federal to private responsibility for the payment of benefits, the 1972 amendments added an additional statutory presumption of total disability due to pneumoconiosis to aid in the qualification process. 30 U.S.C. § 921(c)(4).[11] At the same time, Congress indicated its expectation that the Secretary of Health, Education, and Welfare adopt by regulation "such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments." S.Rep. No. 92–743, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. and Admin.News at 2322.

In response to this directive, the Secretary promulgated regulations entitled "Interim adjudicatory rules for certain Part B claims filed by a miner before July 1, 1973, or by a survivor where the miner died before January 1, 1974." 20 CFR § 410.490.[12] These interim adjudicatory rules establish standards for determining total disability due to pneumoconiosis that are more lenient than the criteria applicable to claimants who filed on or after July 1, 1973.[13] Compare 20 CFR 410.490(b) with 20 CFR § 410.-426 so far as ventilatory studies are concerned, as well as with 30 U.S.C. § 921(c)(3).

Each of the plaintiffs has been diagnosed as suffering from "simple" pneumoconiosis, see *Usery*, 428 U.S. at 3–7, 96 S.Ct. at 2887–2888, and is presumptively considered totally disabled due to that disease under the interim adjudicatory standards of 20 CFR § 410.490(b), if those regulations apply to him. Since the plaintiffs wish to avail themselves of the eligibility standards set forth in § 410.490(b), the importance to them of having their claims deemed filed prior to July 1, 1973 is apparent.

## II

In asserting his lack of jurisdiction over these cases, the Secretary relies upon the following regulation, 20 CFR § 410.226(b):

"*Prospective life of claims.* A claim which is filed before the claimant meets all the requirements for entitlement to such

---

**11.** 30 U.S.C. § 921(c)(4):

"if a miner was employed for fifteen years or more in one or more underground coal mines, and if there is a chest roentgenogram submitted in connection with such miner's . . . claim under this subchapter and it is interpreted as negative with respect to the requirements of paragraph (3) of this subsection, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis. . . . The Secretary may rebut such presumption only be establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine."

In *Usery v. Turner Elkhorn Mining Co.*, supra, note 4, the Supreme Court did not consider the constitutionality of the limitations on rebuttal evidence available to the Secretary under § 921(c)(4), because the claims involved were against the coal operators only, and as to them the court held that the limitations on rebuttal evidence did not apply. Although our disposition of the jurisdictional issue may indirectly make the Secretary of HEW liable for the payment of benefits to the plaintiffs, that issue has not been raised here.

**12.** 20 CFR 410.490(b) provides in part:

"*Interim presumption.* With respect to a miner who files a claim for benefits before July 1, 1973 . . . such miner will be presumed to be totally disabled due to pneumoconiosis . . . if:

(1) One of the following medical requirements is met:

(i) A chest roentgenogram (X-ray), biopsy, or autopsy established the existence of pneumoconiosis. . . ."

Thus, the interim presumption requires simpler proof to get the benefit of a presumption of disability under the regulation, than to get the benefit of the rebuttable statutory presumption under § 921(c)(3). It is apparent that the state of the disease must be less severe to claim the benefit of the presumption under the regulation than under the statute.

**13.** Congress explicitly provided that changes in the law brought about by the 1972 amendments would apply retroactively to benefit claimants whose claims had either been denied under previously existing standards or were still pending. See 30 U.S.C. § 941.

benefits will be deemed a valid claim if the claimant meets such requirements for entitlement (1) before the Administration makes a final decision on such claim. . . If the claimant first meets the requirements for entitlement to benefits in a month after the month of actual filing but before a final administrative or judicial decision is rendered on his claim, his claim will be deemed to have been *effectively filed* in such first month of entitlement." (emphasis added).

It is from this regulation that the doctrine of effective filing has been adopted. Since the presumption of total disability due to pneumoconiosis found in the interim regulations, 20 CFR § 410.490(b) is made rebuttable if "[t]here is evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work," 20 CFR § 410.490(c), the Secretary argues that plaintiffs could not qualify for benefits under those regulations until they stopped working. This, of course, did not occur until "a month after the month of actual filing" as described in 20 CFR § 410.-226(b). The Secretary's position is, therefore, that the claims were not "effectively filed" until after June 30, 1973, when all requirements for entitlement to benefits were first met.[14]

The Secretary has issued a formal ruling interpreting § 410.226(b) to reflect the position outlined above, which is Social Security Ruling SSR 74-32 (November, 1974) and which provides:

"Where a coal miner files an application prior to July 1, 1973 for Black Lung Benefits pursuant to Part B of Title IV of the Federal Coal Mine Health and Safety Act, as amended; . . . the Social Security Administration under authority delegated by the Secretary of HEW, has jurisdiction for paying Part B benefits provided all requirements for entitlement to these bene-

fits are met prior to July 1, 1973, and . . . that where a miner filed an application prior to July 1, 1973, but all requirements are not met before that date the Social Security Administration does not have jurisdiction for paying Part B benefits."

The Secretary, as before stated, construes his own Social Security Ruling and Regulations so that "requirements for entitlement" may not be met so long as a miner is working as above described, and therefore concludes that he has no jurisdiction.

### III

■ Contrary to the Secretary's interpretation of the Act, Regulations, and Ruling 74-32, we hold that the Secretary does have jurisdiction over the administration of the claims here, which were submitted on or before June 30, 1973. Claimants who met this filing deadline are entitled to have their claims adjudicated under the interim standards established by HEW regulations, 20 CFR § 410.490(b). We read "file" as meaning no more than the submission of claim papers to the Social Security Administration, and note that this interpretation is supported by the language of similar HEW regulations. See 20 CFR § 410.227, for example.

■ We are of opinion, however, that, apart from the questions of administrative jurisdiction and applicable adjudicatory standards, claimants must still prove that they were totally disabled due to pneumoconiosis as of June 30, 1973 in order to qualify for lifetime federal benefits. Those who submitted claims prior to the onset of their disability in order to qualify for the more lenient standards may not measure against those standards the state of their health at some undetermined point in the future.[14a] Such a result would cut against Congressional intent in directing promulgation of the interim adjudicatory standards, which

---

14. This chain of reasoning appears inconsistent. If the claims were not filed until after June 30, 1973, the interim presumptions and the provisions pertaining to their rebuttal would have never applied to the plaintiffs in the first place.

14a. We do not imply that the state of a miner's health after June 30, 1973 has no relevance to show whether or not he suffered from black lung disease before that date. It is not conclusive. See *Begley,* infra.

was to facilitate processing of the then existing backlog of black lung claims,[15] within the framework of a statutory scheme that envisioned a federal role of limited duration.[16] Accord *Begley v. Mathews,* 544 F.2d 1345 at 1352, No. 75–2472 (6th Cir. 1976).[17]

■ The fact that plaintiffs in these cases continued to work in the mines beyond June 30, 1973 certainly bears relevance to whether they were totally disabled on that date, and the Secretary is entitled to consider this with all the other evidence.[18] While an administrative determination that the presumption of 20 CFR § 410.490(b) was effectively rebutted by a claimant's continued employment would be permissible under the Act and regulations, the assumption made by the Secretary in these cases, that continued employment must, as a matter of course, rebut the interim presumption of disability is erroneous.[19] Such an approach is contrary to the Secre-

tary's own regulation, as demonstrated below, and bears little relevance to economic realities faced by disabled miners.

20 CFR § 410.490(c) states:

"(c) *Rebuttal of presumption.* The presumption in paragraph (b) of this section *may* be rebutted if:

(1) There is evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work." (emphasis added).

It is clear from its plain wording that the regulation is permissive, rather than mandatory, as, indeed, common experience dictates that it should be. There can be little doubt that, faced with the dictates of economic necessity, some coal miners who suffer from black lung disease have the physical capacity, through ultimate exertion, of continuing to work during the pendency of their claims.[20] There is no inconsistency

15. "[T]he backlog of claims which have been filed under these provisions cannot await the establishment of new facilities or the development of new medical procedures. They must be handled under present circumstances in the light of limited medical resources and techniques.

"Accordingly, the Committee expects the Secretary to adopt such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments." Report of the Senate Committee on Labor and Public Welfare, S.Rep. No. 92–743, 92d Cong., 2d Sess. (1972), 1972 U.S.Code Cong. and Admin.News at 2322.

16. "The Committee bill provides for the sharing of responsibility for disabled miners and their dependents between the Federal government and the coal industry. This concept was established in the original legislation. Those cases which form the backlog of claims—both those which have been denied previously and those which are newly covered under these amendments to the law—will be the responsibility of the Federal government. All future claims will be the responsibility of the coal industry." S.Rep. No. 92–743, supra, 1972 U.S.Code Cong. and Admin.News at 2324.

17. In *Begley,* all the plaintiffs had filed claims before June 30, 1973, and did not work after that date. The question before that court, then, was different from that here.

18. In *Begley v. Mathews,* 544 F.2d 1345, No. 75–2472 (6th Cir. 1976), the court, recognizing *the progressive nature of black lung disease,* rejected the Secretary's contention that evidence of breathing capacity that arose from tests performed after June 30, 1973 was inadmissible as proof of disability under the interim standards. The court held that such evidence could be admitted to establish the existence of disability *prior* to June 30th.

*We likewise hold that evidence of continued employment after June 30, 1973 is relevant evidence of whether a claimant was totally disabled as of that date.*

19. In the case of Otis Taylor, for example, the hearing examiner apparently considered Taylor's employment beyond June 30, 1973 as conclusively establishing that Taylor was not totally disabled within the meaning of the Act at that date. The examiner stated, "Claimant would in all probability have met the interim criteria except for the fact that he continued to work in the mines until he reached the age of 62 in December, 1973." Hearing Decision in case of Otis R. Taylor at 4. While this may have been a permissible finding, it was not a *necessary* one. There is no indication that the hearing examiner considered Taylor's continued employment as simply one fact to be weighed with others in reaching his conclusion.

20. That miners who were intended to receive benefits under the Act may be capable of working in the mines was recognized by Senator Williams, floor manager of the 1969 Act, in the floor debates:

between the Act's definitions of total disability and the minimum state of health required to go back to the mines one more time to insure survival during the pendency of a claim. It is at once apparent that prompt administrative processing of black lung claim papers lodged with the Secretary on or before June 30, 1973 is an effective way of detecting and eliminating the spurious claim.

■ In construing the provisions of a statute, we acknowledge our obligation to accord great deference to the interpretation adopted by the agency charged with its daily administration, *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and to uphold the regulation if it is reasonably related to the purposes of the enabling legislation, *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). This principle is especially true when it is not a statute but an administrative regulation that is the subject of judicial inquiry. *Udall v. Tallman,* supra; *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). An agency's interpretation of its own regulation is of "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles,* 325 U.S. at 413–414, 65 S.Ct. at 1217.

■ Against this background, our rejection of Ruling 74–32 as applied by the Secretary is not undertaken lightly. Nevertheless, it is mandated in our opinion because the Secretary's application of § 410.226(b)

and Ruling 74–32, in view of the plain language of the Act, is unduly restrictive of his own jurisdiction.[21] The Court has made clear the prerogative of the executive agencies to issue regulations "reasonably related" to the purposes of the legislation they are charged with enforcing, *Mourning,* 411 U.S. p. 369, 93 S.Ct. 1652, and to adopt reasonable interpretations of those regulations, *Udall,* 380 U.S. pp. 16–17, 85 S.Ct. 792, without interference from the courts. But the role of the agencies remains basically to execute legislative policy; they are no more authorized than are the courts to rewrite acts of Congress.

■ Congress has conferred jurisdiction on the Secretary of HEW over all claims *filed* on or before June 30, 1973. We find nothing in the language of the Act, nor in its legislative history, suggesting that Congress, when it said "filed," really meant the quite different proposition advanced by the Secretary. As the Supreme Court has said, in only a slightly different context, "In the absence of some contrary indication, we must assume that the framers of these statutory provisions intended to convey the ordinary meaning which is attached to the language they used." *Jones v. Liberty Glass Co.,* 332 U.S. 524, 531, 68 S.Ct. 229, 233, 92 L.Ed. 142 (1947); see *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 75 L.Ed. 156 (1930).

## IV

We think the effective filing doctrine, insofar as it is applied to limit the jurisdic-

---

"[T]he federal government would accept the financial burden for the 50,000 miners who have already been disabled and are no longer employed *or should be no longer forced to struggle through another day's work in the mines.*" Hearings before the Subcommittee on Labor and Public Welfare on S. 2675, S. 2289, H.R. 9212, 92d Cong., 1st and 2d Sess. (1971–72) at 369 (emphasis added).

21. See *Shea v. Vialpando,* 416 U.S. 251, 262, n. 11, 94 S.Ct. 1746, 1754, 40 L.Ed.2d 120 (1974): " . . . the sound principle of according deference to administrative practice normally applies only where the relevant statutory language is unclear or susceptible of differing interpretations." *Espinoza v. Farah Mfg. Co.,*

414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973): "Courts need not defer to an administrative construction of a statute where there are 'compelling indications that it is wrong'." *Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 745, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968): "Courts are the final authorities on issues of statutory construction [citation omitted], and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'"

tion of the Secretary of HEW under the Black Lung Benefits Act, conflicts with the intent of Congress. Although Congress did not address the question in its initial enactments of the statutory scheme, which occurred well before the notion of effective filing was ever applied to limit jurisdiction, it has done so since. In its Report on the Black Lung Benefits Reform Act of 1976 (unpassed at the time of this writing), S.Rep. No. 94–1254, 94th Cong., 2d Sess. (1976), the Senate Committee on Labor and Public Welfare repudiated the Secretary's position in unequivocal terms: "to deny a claim which was filed by June 30, 1973 but not 'effectively filed' until sometime after that date and before the final administrative determination of eligibility is a perverse interpretation of the law which is cruel and unjust," and "[w]hen a claim has been submitted to the Social Security Administration under Part B, it is filed for the purposes of section 414(b), even though additional evidence has been submitted before a final administrative determination of eligibility." S.Rep. No. 94–1254 at 17.

These statements, coming from the same committee that reported the Black Lung Benefits Act to the Senate but four years ago, are persuasive indications of Congressional intent at the time of passage of the Act's amendments. In somewhat similar circumstances, the Supreme Court has con-

sidered subsequent committee declarations of congressional intent "virtually conclusive." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 329–330, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942). While it is not necessary for us to decide whether or not S.Rep. No. 94–1254 is virtually conclusive on the matter of congressional intent in this case, cf. *Levindale Lead and Zinc Mining Co. v. Coleman*, 241 U.S. 432, 439, 36 S.Ct. 644, 60 L.Ed. 1080 (1916); *Koshkonong v. Burton*, 104 U.S. 668, 678, 26 L.Ed. 886 (1881), we do think it is entitled to our studied consideration and find it a rather persuasive authority, although it may not bind us.[22]

In conclusion, because we find the Secretary's interpretation of the filing requirement for jurisdictional purposes in conflict with both the language and intent of the Federal Coal Mine Health and Safety Act, as amended, we vacate the judgment of the district court and remand the case to the district court for further remand to the Secretary for action not inconsistent with this opinion.

*VACATED AND REMANDED.*

---

**22.** Cf. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974): "significant weight"; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969): "great weight." None of the cases cited in this paragraph have indicated the expression of congressional intent in precisely the same way we find it here.

In connection with the weight to give Senate Report No. 94–1254, we have also considered *Regional Rail Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), *Waterman Steamship Corp., v. United States*, 381 U.S. 252, 269, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965), and *United States v. United Mineworkers*, 330 U.S. 258, 282, 67 S.Ct. 677, 91 L.Ed. 884 (1947). These cases caution against giving the intent of a later Congress too much weight in various contexts. In the *Regional Rail Cases*, the intent of Congress was sought to be determined by postpassage statements of Congressmen at a later hearing and an *amicus* brief filed by certain

Congressmen in the Supreme Court; in *Waterman*, such intent was sought from congressional history concerning an amendment to the statute in question, which amendment was vetoed by the same President who signed the original Act because in his opinion the amendment vitiated the congressional intent behind the original statute; and in *United Mineworkers*, it was sought to use expressions, during debates on a bill which failed on the floor of the Senate, by Senators, none of whom was on the committee which reported the bill.

With all of these cases in mind, we do not base our holding entirely, or even principally, on Senate Report No. 94–1254, and we take into account that the Senate Report is on a bill not passed at the time, but we do not believe the committee report should be disregarded, and, as before stated, we feel it is rather persuasive authority to be taken into account along with all the other matters we have mentioned.