Charles WYATT, Appellant,

v.

Joseph A. CALIFANO, Jr., Sec. of Health, Education & Welfare, Appellee.

No. 78–1056.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1980.

Decided April 11, 1980.

Deborah Garton Gibson, Bluefield, W. Va. (Hensley, Muth & Gibson, Bluefield, W. Va., on brief), for appellant.

Rebecca A. Betts, Asst. U. S. Atty., Charleston, W. Va. (Robert B. King, U. S. Atty., James S. Arnold, Asst. U. S. Atty., Charleston, W. Va., on brief), for appellee.

Before BUTZNER and HALL, Circuit Judges, and JONES, District Judge *.

PER CURIAM:

■ Claimant Charles Wyatt appeals from a district court order affirming the decision of the Secretary of Health, Education and Welfare that he was not entitled to "black lung" benefits sought pursuant to the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 901 *et seq.* Our scope of review is confined to determining whether the Secretary's denial was supported by substantial evidence. If such support exists, we must affirm; if not, we must reverse. 30 U.S.C. § 932(b) *incorporating by reference* § 205(b) of the Social Security Act, 42 U.S.C. § 405(b). *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968). In this case we conclude that the Secretary failed to give proper consideration to certain X-ray films and ventilatory studies, and we must remand for further consideration. *Arnold v. Secretary of HEW*, 567 F.2d 258 (4th Cir. 1977).

Claimant was born in 1922 and has an eighth grade education. He testified that he has worked in coal mines since 1948, retiring in 1971. His earnings records, which date back only to 1955, show at least 12½ years of coal mine employment. Claimant testified to breathing difficulties, chest pain, coughing, and problems sleeping at night. His wife corroborated this testimony. Claimant also receives social security disability based on hypertensive vascular disease, pulmonary insufficiency, chronic low back strain, and anxiety neurosis, severe and chronic, associated with depressive neurosis, severe and chronic.

The medical evidence submitted by claimant consists of X-ray films and ventilatory studies. We think both received inadequate treatment by the Secretary.

*X-ray Evidence*

Claimant submitted for consideration five films. The first, dated May 6, 1971, was read by Dr. Charles Nelson, an "A" reader, as indicative of pneumoconiosis, type 2p, 1q.

An X-ray film dated November 8, 1971, was read as normal by an "A" reader, Dr. Ilona Scott. However, a later film dated April 2, 1973, was interpreted by Dr. Scott as consistent with pneumoconiosis, category 1/0 p. This film was reread negative by three "B" readers, Drs. Donna, Siegleman and Rothstein, but Dr. Eugene Pendergrass later reported to the Appeals Council that the film showed pneumoconiosis, p 1/0.

Dr. William Clarke, a specialist in internal medicine and cardiovascular disease,

* Honorable Shirley B. Jones, District Judge, United States District Court for the District of Maryland, sitting by designation.

read an X-ray film dated February 8, 1974, as showing pneumoconiosis, type 1/2 p. Drs. Siegleman and Rothstein both considered this film unreadable.

A final film, dated August 15, 1974, was considered by Dr. H. Lee Bassham, a radiologist, as consistent with pneumoconiosis, type 1/0 q.

The Administrative Law Judge [ALJ] reviewed all five films in his "Summary of Evidence," but in his "Evaluation of Evidence" discussed only four. He relied on the films made shortly before the jurisdictional cutoff date which were reread as negative for the disease, and stated that the two 1974 readings did not provide a basis for establishing the presence of pneumoconiosis on or before June 30, 1973. The ALJ's treatment of the X-ray evidence was supplemented by the Appeals Council, which found "the interpretations of the "B" readers [of the 4/2/73 film] to be more persuasive than that of Dr. Pendergrass." The Appeals Council also stated it did not find the later X-ray films and rereadings persuasive as to the existence of pneumoconiosis on or before June 30, 1973, and accordingly affirmed the ALJ's decision.

The Secretary asks us to infer from these decisions that Dr. Nelson's positive reading of the May, 1971, film was properly considered and rejected. We decline to do so, for as we held in *Arnold, supra* :

> [T]he Secretary, in determining an applicant's entitlement to black lung benefits, must consider all relevant evidence, including that accumulated after June 30, 1973, and must *indicate explicitly that such evidence has been weighed and its weight.*

567 F.2d at 259 (emphasis added). *See also Souch v. Califano*, 599 F.2d 577 (4th Cir. 1979). The Secretary has not articulated any basis for rejecting Dr. Nelson's interpretation, nor do we perceive any in the record. Accordingly, the claim must be remanded to allow the Secretary to reexamine the evidence and, if necessary, obtain additional medical opinion as to whether the 1971 film does indeed establish pneumoconiosis as claimant asserts. *See* 20 C.F.R. § 410.490.

Similarly deficient under *Arnold* is the Secretary's bald statement that Dr. Bassham's unrebutted reading of the August, 1974, film was not persuasive as to the existence of pneumoconiosis on or before June 30, 1973. The Secretary contends, Appellee Br. at 9, that the ALJ's evaluation "can only be read as meaning that the August, 1974 X-ray cannot, in view of the negative April, 1973 X-ray, provide the basis for a determination that claimant suffered from pneumoconiosis at the critical time period—June 30, 1973." We cannot, under *Arnold*, speculate as to what the ALJ meant. It is equally likely that the Secretary's evaluation, made prior to the decisions in *Talley v. Mathews*, 550 F.2d 911 (4th Cir. 1977), and *Arnold*, merely reflected an erroneous assumption that post-June, 1973, X-rays are entitled to no probative weight.

*Pulmonary Function Studies*

The pulmonary function studies submitted by the claimant present a similar problem. Of the three studies submitted, two were taken prior to June, 1973, and did not meet the qualifying values specified in 20 C.F.R. § 410.490(b)(1)(ii). The first, dated January 10, 1972, reported claimant's height as 70 inches and showed an $FEV_1$ of 3.6 and an MBC (MVV) of 85, against qualifying values of $FEV_1$ at or below 2.5 and MVV at or below 100. Another study dated July 26, 1973, reported claimant's height as 69 inches, his $FEV_1$ as 4.0 and an MVV of 162. Both reports noted good cooperation.

The difficulty lies with the Secretary's treatment of a study performed on February 8, 1974, showing claimant's height as 69 inches, an $FEV_1$ value of 1.8 and an MVV of 85.8. Good cooperation was also noted. The Secretary rejected this test, remarking that the results of the earlier tests "were such that doubt is cast on the validity of the very low values attained in February, 1974."

The Secretary's analysis of the third pulmonary function study reflects a medical conclusion by the Secretary which is unsup-

ported in the record. If the Secretary is to discredit medical studies performed by experts in apparent compliance with applicable regulations, he should have some medical basis for doing so.[1] *See Souch v. Califano*, 599 F.2d 577, 581 (4th Cir. 1979). On remand the Secretary may think it appropriate to refer claimant's ventilatory studies to a medical advisor for further evaluation. *See Petry v. Califano*, 577 F.2d 860, 865 n.8 (4th Cir. 1977).

For the above reasons, the judgment of the district court is vacated and the case remanded to the Secretary for further proceedings in conformity with this opinion. On remand, the Secretary should also consider more fully the applicability of the fifteen-year presumption set forth in 20 C.F.R. § 410.414(b). *See Petry, supra.*

*VACATED AND REMANDED.*

---

1. This does not mean the Secretary may never discount, without expert assistance, values reported in a single test which are drastically lower than all previous tests. *See Hubbard v. Califano*, 582 F.2d 319, 321 n.3 (4th Cir. 1978). Although Wyatt's July 1973 values are substantially greater than those shown in February 1974, the January 1972 study showed an MVV value identical to that in the latest report, and we are not prepared to reach a medical conclusion on the present record as to the possibility of a substantially diminished FEV1 value.