John S. VINTSON, Plaintiff-Appellee,

v.

Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant-Appellant.

No. 77–1602.

United States Court of Appeals, Fifth Circuit.

April 16, 1979.

Wayman G. Sherrer, U. S. Atty., Ann C. Robertson, Charles D. Stewart, Asst. U. S. Attys., Birmingham, Ala., William Kanter,

Judith S. Feigin, Attys., App. Sec., Barbara Allen Babcock, Asst. Atty. Gen., Civil Div., Dept. of Justice, Washington, D. C., Andrew E. Wakshul, Dept. of HEW, Social Security Div., Baltimore, Md., for defendant-appellant.

R. Michael Booker, Birmingham, Ala., for plaintiff-appellee.

Before WISDOM, GOLDBERG and VANCE, Circuit Judges.

WISDOM, Circuit Judge:

The Secretary appeals a judgment of the district court for the Northern District of Alabama setting aside for lack of substantial evidence his order denying black lung benefits under Title IV of the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 901 et seq., to John S. Vintson. The district court ordered the Secretary to award benefits to Vintson. The main question presented is whether a court, in reviewing the denial of a claim that could be sustained only under 20 C.F.R. § 410.-490(b)(1)(i), can properly discount the probative force of x-ray rereadings performed at the Secretary's behest when such rereadings do not conflict with any statute or regulation. We hold that it cannot. We find the Secretary's decision to be supported by substantial evidence and reverse the district court's judgment.

## I.

John Vintson filed an application for black lung benefits under the Coal Mine Health and Safety Act in October 1971. When his claim was administratively denied he requested a hearing, and his claim was heard before an administrative law judge in 1974. The ALJ ruled against Vintson, and the Social Security Administration's Appeals Council denied review. That decision was vacated by the district court for the Northern District of Alabama, and Vintson's case was remanded to the Secretary for further administrative proceedings.

On remand the record made at the original hearing was supplemented by new medical evidence, but the result, from Vintson's viewpoint, was no better. In April 1976 the ALJ issued his recommended decision finding that Vintson was not entitled to benefits, and the Appeals Council affirmed.

The administrative record shows that Vintson was employed in the nation's underground coal mines for twelve years. Because of various disabilities, and because Vintson, in his own words, "had no future there and . . . got tired eating that coal dust", he ceased working in the mines in 1950. From 1951 to 1971 Vintson worked as an aircraft maintenance mechanic and supervisor at much higher wages and in a higher status job than he had when he worked in the mines.

The medical evidence in the administrative record is conflicting. In January 1970, Vintson was treated at a Veterans Administration Hospital for a bleeding ulcer. The hospital report revealed a history of alcoholism and ulcers. A chest x-ray taken at that time was clear as to auscultation and percussion.

In December 1971, Vintson was examined by Dr. David Russakoff after Vintson complained of numbness in his feet and shortness of breath. Russakoff conducted a pulmonary function test, which showed a MVV (maximum voluntary ventilation) of 115.15 liters per minute and a FEV-1 (one second forced expiratory volume) of 2.85 liters.[1] These values are too high to establish the presence of a chronic respiratory or pulmonary disease. He read Vintson's x-ray as showing "minimal evidence" for pneumoco-

---

1. The regulations state:

    (ii) In the case of a miner employed for at least 15 years in underground or comparable coal mine employment, ventilatory studies

establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2)) as demonstrated by values which are equal to

niosis category I p. Four NIOSH-certified readers subsequently reread Russakoff's x-rays.[2] All four, Drs. Paul Wheeler, Mordecai Halpern, Harry Davis, and Harold Spitz, found the x-ray completely negative for pneumoconiosis.

In 1973 Dr. Dick Briggs performed a second pulmonary function test on Vintson. Vintson scored a MVV of 143 liters per minute and a FEV–1 of 3.67 liters. According to Briggs, those values were "within normal limits".

Vintson submitted into evidence a report, dated March 27, 1973, from his treating physician, Dr. George H. Weaver. Weaver found chronic pulmonary disease, chronic bronchitis, and emphysema. He concluded that Vintson was disabled from performing coal mine work.

In December of 1973 and January of 1974 Vintson was examined at a Jasper, Alabama hospital by Dr. Daniel Scarbrough. Scarbrough's reports and copies of the hospital records showed a diagnosis of cirrhosis, chronic obstructive pulmonary disease secondary to emphysema, and simple pneumoconiosis. Dr. Scarbrough's finding respecting pneumoconiosis was based on an x-ray taken for him by Dr. Terrel Bird. Dr. Bird found pulmonary fibrosis consistent with simple pneumoconiosis category 1/2 p. Bird also found a mild degree of diffuse nodulation throughout the lung parenchyma. The Bird x-ray was later reread as completely negative by Drs. Davis and Spitz. Davis suggested that vascular shadows in the x-ray impression may have been interpreted by Dr. Bird as pneumoconiotic lesions.

In February 1976 a blood gas study was performed by Dr. Ben Branscomb. The test revealed a p $CO_2$ of 34 and a p $O_2$ of 87 mm Hg.—"normal" blood gases, according to Dr. Branscomb.

In May 1974, Vintson was examined by Dr. Ward J. McFarland. An x-ray was taken and interpreted for Dr. McFarland by Dr. Juan Gonzalez. Dr. Gonzalez saw in the impression nodulation compatible with simple pneumoconiosis category 2/1 q. A pulmonary function test yielded a MVV of 59 liters per minute and a FEV–1 of 3.53 liters. Dr. McFarland observed dyspnea, weight loss, and marked clubbing, which he saw as supporting a diagnosis of diffuse block "such as is seen with pneumoconiosis." He drew the conclusion that Vintson probably had "significant pneumoconiosis". The Gonzalez x-rays, however, were read as completely negative by Drs. Davis and Spitz.

The Act and the Secretary's regulations provide several avenues for establishing entitlement to black lung benefits. If a miner establishes by x-ray, biopsy, or other medically accepted diagnostic procedure that he has complicated pneumoconiosis, section

---

or less than the values specified in the following table:

|  | | Equal to or less than- |
| --- | --- | --- |
| 67″ or less | 2.3 | 92 |
| 68″ | 2.4 | 96 |
| 69″ | 2.4 | 96 |
| 70″ | 2.5 | 100 |
| 71″ | 2.6 | 104 |
| 72″ | 2.6 | 104 |
| 73″ or more; and | 2.7 | 108 |

The values for a man of Vintson's height, found by the ALJ to be 72 inches, are a FEV–1 of 2.6 liters, and a MVV of 104 liters per minute. 20 C.F.R. § 410.490. The values yielded by the Russakoff and Briggs tests were sub-stantially higher than the specified values. Dr. McFarland's tests, which did not meet the standards of 20 C.F.R. § 410.420 because the analyzer he used does not produce spirograms, produced mixed results. They showed a FEV–1 of 3.53 liters, well above standard, and a MVV of 59 liters per minute, well below the standard value and well below the MVV values yielded by the Russakoff and Briggs tests.

2. The reading of coal miners' x-rays is a specialty. Those physicians who meet the standards of the National Institute of Occupational Safety and Health (NIOSH) are certified as qualified to read miners' chest x-rays. Drs. Wheeler, Halpern, Davis, and Spitz are all NIOSH-certified readers. Dr. Spitz is certified as a "B" reader—the highest qualification under NIOSH standards.

411(c)(3) of the Act, 30 U.S.C. § 921(c)(3), entitles him to an irrebuttable presumption that he is totally disabled because of pneumoconiosis. *See also* 20 C.F.R. § 410.418. Under Section 411(c)(4) of the Act, a claimant who has worked fifteen or more years in the nation's underground coal mines is entitled to a rebuttable presumption of total disability because of pneumoconiosis arising out of his employment as a miner if he shows that he is totally disabled due to respiratory or pulmonary impairment. Additional presumptions are set forth in 20 C.F.R. § 410.490(b)(1). Under subpart (i), a miner with ten years' experience in the nation's coal mines is entitled to a rebuttable presumption of totally disabling, job-related pneumoconiosis if he establishes by x-ray or biopsy the existence of simple pneumoconiosis. Subpart (ii) entitles a miner with fifteen years experience to the same rebuttable presumption if the values yielded by ventilatory function studies are less than or equal to the values specified in the table set forth in the regulation.

Because Vintson failed to demonstrate the existence of complicated pneumoconiosis, the ALJ ruled that he was not entitled to section 411(c)(3)'s irrebuttable presumption. The ALJ found, and it is undisputed, that Vintson did not work fifteen years in the mines. He therefore could not rely on the section 411(c)(4) presumption. And because Vintson's scores in the pulmonary function tests were consistently far higher than the values specified in the regulation, the ALJ ruled that the section 410.490(b)(1)(ii) presumption was inapplicable. Vintson's hopes for recovery rested on section 410.490(b)(1)(i). Looking to the preponderance of the x-ray readings, the ALJ concluded that Vintson failed to establish by his x-ray evidence that he suffered simple pneumoconiosis and that Vintson therefore was not entitled to the presumption provided by section 410.490(b)(1)(i).

Vintson again filed suit in district court seeking review of the Secretary's decision. The court held that the decision denying benefits was not supported by substantial evidence. The district court was cognizant that there was no lack of evidence in the record supporting the decision but ruled that the ALJ gave far too much weight to that evidence.

The court was impressed that, with the exception of Dr. Russakoff, the physicians who examined the plaintiff in person, taking into account not only x-ray impressions but physical signs, appearance, and history, diagnosed Vintson's ailment as pneumoconiosis or found evidence of pneumoconiosis. The court characterized Dr. Briggs' pulmonary function test as "marginally reliable"; the pulmonary function and blood gas studies the court denigrated as reporting "only results of mechanical performances". The court felt that section 413(b) of the Act, 30 U.S.C. § 923(b), counseled minimizing the probative value of the x-ray rereadings performed by the contract readers. That provision, enacted as part of the Black Lung Benefits Act of 1972, prohibits the denial of a claim solely on the basis of x-ray evidence, and commands the Secretary to look to all relevant evidence in determining the validity of claims. The provision, in the district court's view, has the further effect of enhancing the weight of medical evidence resulting from a physician's evaluation of the "whole man". The x-ray rereadings and the "mechanical" pulmonary function and blood gas studies were found to be insubstantial in comparison with the diagnoses made by the physicians who personally examined Vintson. The claimant, the court ruled, had established his entitlement to the interim presumption in § 410.490(b)(1)(i). Since the evidence failed to rebut the presumption,[3] Vintson was held to be entitled to his benefits.

## II.

Section 413(b) of the Act incorporates section 205(g) of the Social Security Act, 42

---

**3.** The presumptions of § 410.490(b)(1) can be rebutted only by showing either that the claimant is in fact doing "his usual coal mine work or comparable or gainful work" or that he is able to do comparable work. 20 C.F.R. § 410.490(c). The evidence was overwhelming that due to his various disabilities Vintson is no

U.S.C. § 405(g), which makes the Secretary's fact findings conclusive if supported by substantial evidence.

The only genuine issue raised by the Secretary's appeal is whether the district court erred in holding that the Secretary's determination that the claimant was not entitled to the section 410.490(b)(1)(i) presumption was unsupported by substantial evidence. There is no question that Vintson failed to satisfy the criteria of section 411(c) and of 20 C.F.R. § 410(b)(1)(ii). Vintson does not urge on appeal that the district court's judgment could be affirmed on the ground that substantial evidence did not support the decision that Vintson was not entitled to benefits under those provisions.[4] The sole issue is his entitlement under 20 C.F.R. § 410.490(b)(1)(i).

The regulation provides that a miner who files a claim for benefits before July 1, 1973, will be presumed to be totally disabled due to pneumoconiosis if "a chest roentgenogram (x-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428)". 20 C.F.R. § 410.490(b)(1)(i). Section 410.428, in turn, defines pneumoconiosis as including pneumoconiosis "classified as 1, 2, 3, A, B, or C" according to one of certain accepted classification systems. In this case, four x-rays of Vintson's chest—the Veterans' Administration Hospital x-ray, that taken by Dr. Russakoff, and those taken for Drs. Scarbrough and McFarland—had been taken. The ALJ determined that those x-rays did not establish pneumoconiosis. The district court's narrow task was to decide whether that factual determination was adequately supported by the evidence.

We have reviewed the evidence in Part I of this opinion. The Russakoff x-ray was read by Dr. Russakoff himself as showing minimal evidence of pneumoconiosis. Four of the Department's contract physicians reread that x-ray as completely negative. The Scarbrough x-ray was originally read by Dr. Bird, who found evidence "consistent with" simple pneumoconiosis. Dr. Scarbrough found simple pneumoconiosis. Two Department rereaders read that x-ray as completely negative. Dr. Gonzalez read the x-ray for Dr. McFarland. He found evidence consistent with simple pneumoconiosis, and Dr. McFarland found significant pneumoconiosis. The two Department rereaders read that x-ray as wholly negative. As to each x-ray in issue, with the exception of the VA hospital x-ray, there was a genuine division of medical opinion.

■ It is not the task of a reviewing court to reweigh the evidence. *Gaultney v.*

---

longer able to do work comparable to his work in the mines.

**4.** At oral argument the appellee urged that the law judge could have ruled that he was entitled to the rebuttable presumption arising from proof of the existence of a totally disabling respiratory or pulmonary impairment even though he fell short of the requisite fifteen years' experience in the coal mines. Section 411(c)(4) of the statute conditions entitlement to the presumption on fifteen years' experience in the mines, but the implementing regulation, 20 C.F.R. § 410.414, permits the Secretary in exceptional cases to grant a claimant the benefit of the presumption despite the claimant's failure to meet the strict statutory fifteen-year requirement:

> [W]here the evidence shows a work history reflecting many years of such coal mine employment (although less than 15), as well as a severe lung impairment, such evidence may be considered, in the exercise of sound judg-

ment, to establish entitlement in such case, provided that a mere showing of a respiratory or pulmonary impairment shall not be sufficient to establish such entitlement.

20 C.F.R. § 410.414(b)(4).

Although the ALJ did not specifically address the issue of Vintson's entitlement under section 410.414(b)(4), there is little point in remanding to the Secretary for a special finding in this regard, because the ALJ found that Vintson, though perhaps totally disabled by a variety of impairments, was not suffering from a severe respiratory impairment. Looking to the pulmonary function tests, the blood gas studies, and the diagnoses of the examining physicians, the ALJ found no evidence of "functional impairment of the lungs". Recommended Hearing Decision at 13. Those findings, which are supported by substantial evidence, preclude entitlement under the "special case" rule of section 410.414(b)(4).

*Weinberger*, 5 Cir. 1974, 505 F.2d 943; *Jackson v. Richardson*, 5 Cir. 1971, 449 F.2d 1326. The question for the reviewing court is whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 1970, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842. We have said that "determinations which are not supported by substantial evidence are unusual, even rare." *Gaultney v. Weinberger, supra*, at 945. Certainly the negative evidence, if competent and entitled to such weight as the trier of fact could reasonably and lawfully give it, was "such as a reasonable mind might accept as adequate" to support the finding that the x-rays did not establish pneumoconiosis. Unless the evidence unfavorable to the claimant was, as the district court held, entitled to but minimal weight as a matter of law, the Secretary's determination was adequately supported.

The district court based its ruling on the weight of the negative x-ray readings on section 413(b) of the Act. That subsection states in part that "no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram". The court did not rule that that provision of section 413(b) forbids the Secretary to rule against a claim of entitlement to the section 410.490(b)(1)(i) presumption on the basis of negative x-ray readings. Because entitlement to that presumption turns solely on whether x-rays establish the existence of pneumoconiosis it would be unreasonable to prohibit the Secretary from relying on x-ray readings in determining its applicability.[5] Rather, the court said that section 413(b) "is significant in evaluating the weight to be afforded those re-readers where the re-readers . . had no opportunity to evaluate anything other than a bare x-ray." Memorandum

Opinion at 6–7. The district court apparently felt that although section 413(b) does not in terms speak to the weight of the evidence, the statute nevertheless implies that x-ray re-readings are entitled to little weight.

The basis for the district court's view of the impact of section 413 is not made explicit in its brief opinion, but apparently the court relied on its understanding of the legislative history and purpose of the provision. Section 413 was amended in 1972 in response to congressional recognition that the chest x-ray is an imperfect means for diagnosing the presence of pneumoconiosis. Congress had before it evidence that autopsies often revealed the presence of the disease in cases in which x-rays had failed to discover the disease. *See generally*, S.Rep. No.92–743, 92nd Cong., 2nd Sess., 1972, *reprinted* in [1972] U.S.Code Cong. & Admin. News pp. 2305, 2309. Studies suggested that chest x-rays erred perhaps in 25 percent of the cases in diagnosing pneumoconiosis. *Id.* at 2313–2314. The Senate Report stated:

> [T]he disease is difficult to diagnose, especially in the early stages, and accurate diagnosis depends on three essentials—a high quality full-size radiograph of the chest, a full clinical examination (including lung function tests) and complete industrial history.

*Id.* at 2316. It was probably on this aspect of the legislative history that the district court based its theory that the reports and testimony of physicians who examined the "whole man" are entitled to significantly greater weight than the x-ray readings of physicians who have not.

There is no justification, however, for looking past the statute to its legislative history in this case.[6] The inadequacy of x-ray evidence in diagnosing pneumoconio-

---

**5.** The regulation was promulgated after the enactment of the 1972 amendments, and, indeed, in response to those amendments. 20 C.F.R. § 410.490(a). That the Secretary issued the regulation pursuant to the amendments is strong evidence that the regulation does not conflict with the amendments.

**6.** Even if the district court's "whole man" theory had merit Vintson would not stand to bene-

sis explains the amendment of section 413. It also explains why Congress and the Secretary have relaxed claimants' evidentiary burdens in many other respects.[7] Indeed, the regulation under which Vintson sought his benefits, 20 C.F.R. § 410.490(b)(1), is one example of that liberalization. Before the promulgation of that regulation, proof of the presence of simple pneumoconiosis did not entitle a claimant to any evidentiary presumption. The regulation goes beyond the statute itself in liberalizing the requirements for entitlement to benefits. The statutory amendments and the new regulations represent the congressional and administrative responses to the problems described in the legislative history. That history does not give the courts a commission to fashion new liberalizing rules not fairly implicit in the statute and regulations themselves.

We find in the statute and regulation no fair basis for discounting the weight of x-ray rereadings performed by physicians who have not examined the "whole man". Section 413(b) commands the Secretary to look to all relevant evidence. The ALJ did look to all relevant evidence in determining Vintson's entitlement under section 411 of the Act. Section 413 has no application, however, to the determination of entitlement under the regulation's interim criteria. The statute does not prevent the Secretary from issuing regulations liberalizing the criteria for entitlement that focus the inquiry on a single type of evidence. If the tables were turned, the Secretary could not invoke section 413 to deny benefits on the basis of evidence drawn from examination

of the "whole man" in a case in which every reading of the claimant's x-rays indicated the presence of simple pneumoconiosis.

The appellee argues that the district court was justified in discounting the negative rereadings because those readings, unlike the readings taken by Drs. Russakoff, Bird, and Gonzalez, were made for purposes of litigating the claim and not for diagnosis and treatment. It is true that courts, see, e. g., Puckett v. Mathews, 1976, W.D.Va., 420 F.Supp. 364; Stewart v. Mathews, 1976, W.D.Va., 412 F.Supp. 235, and recently, Congress have expressed disapproval of the Secretary's practice of securing successive rereadings of chest x-rays in black lung benefit cases. As one court has observed

> "[I]f the Law Judge continues to seek re-readings ad infinitum, he will eventually come upon a conservative reader who will find the films to be negative. However, in the process, the Law Judge renders the non-adversary administrative adjudication of claims a meaningless exercise".

Stewart v. Mathews, supra, at 238.

■ We are not persuaded, however, that the proper response to the problem of occasional abuse in this regard is to hold that rereadings, as a matter of law, do not constitute substantial evidence. Such a remedy would overshoot its mark. Congress has already acted on the problem. The Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95, effects a very specific remedy. Section 5(a) of the Act amended section 413(b) to forbid the Secretary to reread x-rays that have been read favorably to the claimant by a board-certi-

fit, for the x-ray readings favorable to him were not given by physicians who examined him personally. Drs. Bird and Gonzalez, who rendered the favorable readings, never examined the claimant. They read x-rays for physicians who did examine Vintson, but the examining physicians, Drs. Scarbrough and McFarland, did not themselves read the x-rays. Thus the Bird and Gonzalez readings have the same status, under the court's "whole man" theory, as the rereadings of Drs. Wheeler, Halpern, Davis, and Spitz. The only physician who both personally examined Vintson and read his x-rays

—Dr. Russakoff—found but minimal evidence of pneumoconiosis.

7. Section 411(c)(4), for example, dispenses altogether with the necessity of proving the existence of pneumoconiosis in cases of claimants who worked fifteen or more years in underground coal mines. Under that provision the claimant is entitled to a rebuttable presumption that he is totally disabled due to pneumoconiosis if he can demonstrate that he suffers from a totally disabling respiratory or pulmonary ailment.

fied radiologist unless "the Secretary has reason to believe that the claim has been fraudulently represented"[8]. Although it is often said that the disposition of black lung benefits claims is a nonadversarial process, see, e. g., Stewart v. Mathews, supra, the Secretary's duty to weed out unmeritorious claims necessarily injects certain adversarial features into the claims process. This is the reason Congress did not outlaw the practice of rereading except where the first reading is by a radiologist certified as expert in reading for pneumoconiosis.

We recognize, as the appellee urges, that few claimants are financially able to hire specially qualified readers. We feel, nonetheless, that claimants are adequately protected by the amended section 413(b) and by the power of the reviewing court, in cases of patent abuse on the part of the Department, to overturn the Secretary's decision as unsupported by substantial evidence. The district court in this case did not find any abuse of the power to order rereadings; nor do we. Only two of the four original readings found evidence consistent with simple pneumoconiosis. Dr. Russakoff found minimal evidence; the Veterans Administration Hospital found nothing. The original readings indicated a "close call". Rereadings were therefore not only permissible, but necessary.[9]

█ We conclude that the district court had no authority to reweigh the evidence as it did.[10] Viewing the x-ray rereadings as

---

8. Section 413(b) provides:

> [T]he Secretary shall accept a board certified or board eligible radiologist's interpretation of a chest roentgenogram which is of a quality sufficient to demonstrate the presence of pneumoconiosis submitted in support of a claim for benefits under this title if such roentgenogram has been taken by a radiologist or qualified technician . . . . .

The claimant has not challenged the Secretary's decision on the basis of this amendment even though the amendment was in effect at the time the law judge's decision was rendered, if not at the time of the hearing. One of the x-rays reported in the record was taken and originally read as positive for simple pneumoconiosis by Dr. Gonzalez, who, according to the ALJ's opinion, was a board-certified radiologist. If the amendment to section 413 is interpreted to compel the Secretary to accept the positive Gonzalez interpretation and to reject the negative interpretations of other x-rays, then Vintson would be entitled to his benefits. The amendment does not, in our view, compel that result. The amendment was intended to curb the Secretary's practice of ordering the rereading of x-rays. The situation envisioned by Congress is the simple one in which the claimant submits a favorable x-ray report in support of his claim. In that pure case the Secretary would be constrained to accept the report if the report was that of a board-certified physician. This case does not fit the paradigm. The x-ray which Dr. Gonzalez reported was the fourth x-ray of Vintson's chest reported in the record. One x-ray, that taken in the Veterans' Administration Hospital, had been read as negative by a physician of unknown qualifications. Two x-rays, the Russakoff and Bird x-rays, had been read as negative by a number of certified readers. Although the statute does not, as we

read it, compel the Secretary to accept the negative readings of board-certified readers, we doubt that it compels the acceptance of a single favorable reading in the face of several, unfavorable readings of x-rays submitted earlier or contemporaneously. In cases in which numerous x-rays have already been taken and read for the record the statute should operate only to forbid rereading of an x-ray favorably interpreted by a qualified reader and not to compel the Secretary to ignore the earlier x-ray reports altogether.

9. 42 C.F.R. § 37.52 provides:

> All chest roentgenograms interpreted by "A" readers will be submitted . . . to a "B" reader qualified as described in section 37.51, whose interpretation shall be final. If the first interpretation is by a "B" reader, it shall be final.

In this case all the x-rays were eventually submitted, as required by the regulation, to a NIOSH-certified "B" reader—Dr. Spitz.

10. A number of cases suggest that reports of non-examining physicians interpreting chest x-rays should be discounted because such reports lack the reliability of personal examinations as well as the reliability of first-person testimony. See, e. g., Martin v. Califano, 1977, E.D.Pa., 433 F.Supp. 636; Donahue v. Weinberger, 1976, E.D.Pa., 414 F.Supp. 844. Whatever the merits of this view, it is inapplicable to cases under 20 C.F.R. § 410.490(b)(1)(i), in which the sole issue is the interpretation of chest x-ray impressions. In Vintson's case, as we pointed out in note 5, supra, none of the x-ray readings, with the exception of Dr. Russakoff's inconclusive reading, was rendered by physicians who personally examined the claimant. None of the readers, moreover, testified at the hearing. All the x-ray interpretations entered the record in the form of terse written reports.

fully competent evidence, we conclude that the Secretary's decision was supported by substantial evidence.[11] The district court's judgment is REVERSED. We AFFIRM the decision of the Secretary.

REVERSED.

11. Even if the rereadings of the Gonzalez x-ray are ignored, *see* note 8, *supra*, the evidence is adequate to support the Secretary's decision.