James A. PRATER, Appellant,

v.

Patricia Roberts HARRIS, Secretary of Health & Human Services, Appellee.

No. 79–1355.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1980.

Decided May 14, 1980.

William J. Sturgill, Norton, Va. (Sturgill & Stump, P.C., Norton, Va., on brief) for appellant.

Fred Marinucci, Asst. Regional Atty., Philadelphia, Pa. (Stephanie W. Naidoff, Regional Atty., Dept. of HHS, Philadelphia, Pa., Paul R. Thomsen, Jr., U. S. Atty., Robert S. Stubbs, Asst. U. S. Atty., Roanoke, Va., on brief) for appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and HAWKINS *, District Judge.

MURNAGHAN, Circuit Judge:

### Factual Background

James A. Prater labored in the underground coal mines of Virginia for over 18 years. During that time, he worked primarily as a machinist. Prater's medical history was unremarkable until 1957, when, while working, Prater broke his back in a slate fall. Despite the severe anxiety that the accident caused him, he returned and continued to toil in the mines until December 1965 when, at the age of 40 and with the responsibilities of a wife and four children of school age, Prater, a man with a second grade education, was forced to leave his job because of breathing difficulties.

Prater applied for black lung benefits under the Federal Coal Mine Health and Safety Act [1] on January 2, 1970. The first administrative law judge to examine the claim denied it. Review upon a request for reconsideration was unavailing. On November 5, 1973, the Bureau of Disability Insurance reexamined the claim and affirmed the previous denial. Shortly thereafter, the claimant requested, and was granted, a hearing before the Bureau of Hearings and Appeals. The hearing was held, after which, on January 30, 1976, the administrative law judge once again concluded that the claimant had not established his entitlement to benefits. The Appeals Council upheld the Bureau's decision. The claimant then sought relief in the United States District Court for the Western District of Virginia. That court, on October 18, 1977, concluding that the Secretary committed error by not considering medical reports submitted by Dr. Buddington, remanded the case to the Secretary for further development of the record in what it perceived to be an "inadequate administrative adjudication." On remand, the Ap-

---

* The Honorable Falcon B. Hawkins, United States District Judge for the District of South Carolina, sitting by designation.

1. 30 U.S.C. §§ 901–945 (1971 & Supp.1979).

peals Council re-evaluated the evidence, in light of Dr. Buddington's reports, and concluded that benefits were inappropriate. The District Court affirmed the denial. The claimant filed an appeal with this court on May 7, 1979, over 9 years after he first had applied for benefits. The sole issue raised by the appeal is whether the Secretary's decision that he was not suffering from pneumoconiosis on or before June 30, 1973, is supported by substantial evidence.[2] To answer this question, we must examine carefully the evidence adduced at trial.

The claimant and his wife, Marie Prater, testified at the September 30, 1975 hearing before the Bureau of Hearings and Appeals. Prater told the administrative law judge it was in 1965 when he first noticed that he was having breathing problems. From that date onward, the problems became progressively worse, causing a severe curtailment of his activities. Prater said he could climb neither stairs nor slight inclines without experiencing a shortness of breath which necessitated that he stop and rest before continuing. According to Prater, he is unable to sleep at night, and he must sit up periodically in order to breathe. Despite attempts to perform household chores, the claimant said he was unable to do so. Marie Prater corroborated her husband's testimony.

A summary of the voluminous medical evidence, spanning a 16-year period from 1962 to 1978, reveals the following:

(1) The claimant had suffered two heart attacks;

(2) In April 1962, Dr. D. B. Jones examined the claimant's chest X-ray. He found "very minimal fibronodose infiltration emphysema bilaterally but no evidence of parenchymal involvement, pulmonary congestion or pulmonary edema of either lung field. . . . ";

(3) Two years later, in late February 1964, the claimant was hospitalized for over a week in St. Albans Psychiatric Hospital where the doctors discovered some indication of pulmonary emphysema and diagnosed the claimant as suffering from psychoneurotic anxiety reaction;

(4) Dr. Ralph W. Hess, in May 1964, concluded that Mr. Prater was suffering from psychoneurosis as well as showing indications of a kidney disorder;

(5) Two years passed before the claimant was hospitalized again, this time at Appalachian Regional Hospital in August 1966. There the physicians took a chest X-ray which revealed that the claimant's lungs appeared normal. The results of a pulmonary function test and blood gas study ($PCO_2$ of 26.3 and $PO_2$ of 83.8) were within the normal ranges. The diagnosis was chronic bronchitis;

(6) Drs. Robert A. Abernathy and W. B. Davis examined the claimant on September 14, 1967. They interpreted a chest X-ray as indicating that the lungs were clear. Results of a pulmonary function test were within normal limits. It was their opinion that the claimant was suffering from chronic severe anxiety with depressive features and was developing Meniere's syndrome, accounting for his attacks of vertigo;

(7) On March 1, 1968, Dr. P. G. Gregoriou diagnosed claimant as suffering from chronic bronchitis, emphysema, severe neurosis, and osteoarthritis;

(8) Dr. N. E. Appersaw, in July 1968, examined a chest X-ray, *not* classified under the standard system, and stated that it revealed fibrosis and probably silicosis. Examining the same film, Dr. E. N. Sargent, a certified "B" reader, found that while the film was of acceptable quality and showed opacities of category 0/1, it did not show pneumoconiosis;

(9) In October 1968, Dr. William F. Schmidt, an "A" reader, interpreted a chest X-ray as indicating pneumoconiosis catego-

---

**2.** The Secretary of HEW, now the Department of Health and Human Services, has jurisdiction only over those claims that were filed on or before June 30, 1973 and that show disability because of pneumoconiosis or respiratory disease as of that date. *See* 30 U.S.C. §§ 924(a)(1), (b) (Supp.1979); *Talley v. Mathews,* 550 F.2d 911, 913 (4th Cir. 1977). After that date, the Department of Labor is charged with the administration of the Act.

ry PN/1p; however, Dr. George Jacobson found the same X-ray to be completely negative for pneumoconiosis;

(10) A November 20, 1968 medical report by Dr. Schmidt, although containing findings consistent with pneumoconiosis, could not be considered because it did not comply with the requirements of 20 C.F.R. § 410.-430, therefore it was deemed inadequate to establish respiratory impairment;

(11) It was Dr. Appersaw's opinion, based upon a February 5, 1969 chest X-ray, that the claimant was suffering from moderate emphysema or silicosis, stage 1;

(12) On February 16, 1970, Dr. Kenneth Payne, an "A" reader, interpreted a reticular increase in lung markings in an X-ray as suggestive of early pneumoconiosis; Dr. Sargent classified the same X-ray as UICC category 0/1p or not of such severity to be disabling;

(13) Dr. Leonard J. Bristol, a "B" reader, found no indication of pneumoconiosis in a June 1970 chest X-ray;

(14) In another June 1970 chest X-ray, Dr. Jack K. Bentley too was unable to find evidence of pneumoconiosis;

(15) Dr. U. S. Gonzalez conducted a pulmonary function study on October 7, 1970. The claimant's height was 69½ inches, his $FEV_1$ was 2.9, and his MVV was 44 L/min. These values were not indicative of chronic respiratory or pulmonary disease;

(16) Dr. W. L. Murphy found an X-ray of April 1971 to be completely negative of pneumoconiosis; Dr. Sargent concurred with Dr. Murphy's evaluation;

(17) Although not completely negative, Dr. Murphy felt that a July 1971 X-ray did not show pneumoconiosis; in this conclusion, both Dr. S. I. Margulies and Dr. Sargent concurred;

(18) A July 1971 X-ray was interpreted by Dr. William C. Barr as negative for pneumoconiosis;

(19) However, on May 10, 1972, Dr. J. M. Straughan, an "A" reader, diagnosed pneumoconiosis category PN 2/1p from an X-ray; Dr. Sargent examined the same film and stated that despite a few questionable opacities it did not indicate pneumoconiosis. Dr. Aaron S. Weinstein, a "B" reader, found that the X-ray was completely negative of pneumoconiosis;

(20) Dr. P. L. Odom examined the claimant on June 7, 1972. In his report he stated that, "[t]he breath sounds were clear; there were no rales, rhonchi, or wheezing . . . There was no cyanosis or clubbing of the nail beds and no edema of the extremities. A chest X-ray . . . revealed an increased cardiac diameter. There was evidence of pulmonary emphysema. There were fine, rounded opacities scattered throughout both lungs consistent with coal worker's pneumoconiosis, category 2/1q (UICC)." A pulmonary function test produced values of a $FEV_1$ of 2.9L and a MVV of 83.9 L/min. At the time of the test, claimant was 69 inches tall. These values did not trigger the disability presumption. Dr. Odom concluded that the claimant was experiencing moderate respiratory impairment; Dr. Sargent classified the same X-ray as UICC category 0/1p;

(21) A pulmonary function study was done by Dr. Paul Van Lith in August 1972, indicating normal breathing capacity. The claimant's height was 70 inches, his $FEV_1$ was 3.35L, and his MVV was 160L/min;

(22) A September 1973 medical report from Dr. Gregoriou stated that the claimant was known to have chronic lung disease, however, because the report was not supported by clinical findings, it could not be considered;

(23) From a November 26, 1973 X-ray, Dr. Straughan diagnosed pneumoconiosis of category 2/2p; Dr. Sargent, noting that the film was of poor quality, disagreed with Dr. Straughan's classification and reclassified the film as 0/1p; Dr. Benjamin Felson, a "B" reader, examined the same film and stated that the film was of poor quality and did not indicate pneumoconiosis;

(24) Dr. W. J. Boyd conducted a blood gas study on September 24, 1974. Dr. Boyd reported that the claimant's $PCO_2$ was 34 mmHg and his $PO_2$ was 59 mmHg, qualifying him "for black lung benefits under the Social Security Black Lung Standards";

(25) Dr. H. Lee Bassham examined an X-ray taken on September 24, 1974. He found "[s]mall rounded discrete pulmonary opacities principally 1–1.5 mm." which indicated pneumoconiosis category 1/1p; Dr. Felson reread this X-ray as negative for pneumoconiosis;

(26) It was Dr. Jack K. Bentley's opinion that a June 1975 X-ray showed no indication of pneumoconiosis; Dr. Felson concurred in Dr. Bentley's diagnosis;

(27) Dr. G. S. Kanwal, on December 1, 1975, conducted a blood gas study, producing values of a $PCO_2$ of 33 and a $PO_2$ of 70, which did not give rise to a presumption of disability;

(28) Dr. R. S. Buddington conducted a physical examination of the claimant and a blood gas study on February 16, 1976. His findings were: "1) Severe pulmonary disease as evidenced by arterial blood gases at rest including $(A-a)O_2$ and history and physical examination. 2) Test results indicate that this patient's primary pulmonary disease is black lung. 3) X-ray report by Dr. H. L. Bassham, dated 9–24–74 indicated 1/1p." The blood gas study produced results qualifying the claimant for benefits under the Act (a $PaO_2$ of 61 mmHg and a $PaCO_2$ of 33 mmHg). From the examination of the blood gas study, and his prior history, it was Dr. Buddington's opinion that Mr. Prater was suffering from "marked respiratory impairment," a condition which was present prior to June 30, 1973.

(29) In Dr. Buddington's November 1977 deposition, he expressed the opinion that Mr. Prater had "moderate to severe chronic respiratory impairment based on [his] examination, his arterial blood gases at rest, and a calculated $(A-a)O_2$." (Record Appendix at 80). He also stated:

Mr. Prater falls, in my opinion, into the worst 5% of all miners. We only can find about 5% of the miners who truly qualify for Social Security standards. And this makes him among the very most severely affected of all miners from Southwestern Virginia that we see. And he's unable to do heavy . . . he is certainly not able to do any sort of physical labor. I

mean, he is practically in a position where he would have difficulty performing his day to day functions, you know, like getting out of bed and making the bed, fixing breakfast, I mean, almost to that point.

\* \* \* \* \* \*

I think it is medically reasonable to assume that it was present for the last five or ten years. (Record Appendix at 81, 82).

(30) The Appeals Council submitted all the above evidence to Dr. Wilder P. Montgomery, a consultant to the Bureau of Hearings and Appeals. Dr. Montgomery reviewed the medical evidence, commenting only upon the four blood gas studies. He noted that: the August 8, 1966 test suggested a mild degree of hypoxemia; (2) the September 24, 1974 test produced values equivalent with the table values; (3) yet the December 1, 1975 test indicated only a mild degree of hypoxemia and did not produce values equivalent to those in the table; and (4) the February 16, 1976 test produced values equivalent with the table. Analyzing these results, Dr. Montgomery concluded:

In view of the fluctuating values, I am unable to state what the claimant's $(A-a)O_2$ difference or $PO_2$ would have been on June 30, 1973, the expiration date for social security jurisdiction. The normal expectation would be that the $(A-a)O_2$ difference would be less on June 30, 1973 than that determined on a subsequent date due to the progressive nature of obstructive airway disease. As a result, it is my opinion that the available medical evidence is insufficient for formulation of a decision as to claimant's functional capacity on June 30, 1973.

Before reaching its decision, the Appeals Council provided the claimant an opportunity to submit additional evidence and to respond to Dr. Montgomery's medical analysis. When no response was forthcoming from the claimant, the Council proceeded to render its opinion in which it affirmed, with supplementation, the administrative law

judge's decision of January 30, 1976. Reviewing Dr. Montgomery's findings, the Council stated:

> In view of the fluctuating values, Dr. Montgomery is unable to state what the claimant's $(A–a)O_2$ difference or $PO_2$ would have been on June 30, 1973. According to Dr. Montgomery, the normal expectation would be that the $(A–a)O_2$ difference would be less on June 30, 1973, than that determined on a subsequent date due to the progressive nature of obstructive airway disease. As a result, it is Dr. Montgomery's opinion that the available evidence is insufficient for formulation of a decision as to the claimant's functional capacity on June 30, 1973.

The Council, finding Dr. Montgomery's analysis "persuasive," concluded that the $(A–a)O_2$ value in Dr. Buddington's deposition "[did] not substantiate a totally disabling chronic respiratory disease on or before June 30, 1973." In its listing of findings, the Council found: (1) the preponderance of the X-ray evidence did not indicate pneumoconiosis; (2) the results from the pulmonary function tests exceeded the table criteria for establishing respiratory impairment; (3) the "credible evidence" did not "demonstrate significantly impaired lung function as a result of a chronic respiratory or pulmonary impairment;" and (4) the preponderance of medical evidence did not support a finding of total disability because of pneumoconiosis or other chronic respiratory or pulmonary impairment.

The claimant argues that the medical evidence and lay testimony clearly demonstrated that he was suffering from a totally disabling chronic respiratory impairment on or before June 30, 1973, therefore, the Secretary's conclusion to the contrary was not supported by substantial evidence. Furthermore, since he had worked in the coal mines for over 15 years and established the existence of a disabling respiratory impairment, he had established a prima facie case of disability, thus, shifting the burden of proof to the Secretary, who, to rebut the prima facie case, had to show the claimant did not have pneumoconiosis or that the respiratory impairment did not arise from his coal mine employment. The Secretary responds to these contentions by arguing that the presumption of disability never arose and that its decision is supported by substantial evidence.

### The Law

■ To recover black lung benefits a claimant must submit evidence that demonstrates, by a preponderance of the evidence,[3] that "he is a coal miner, that he is totally disabled[4] due to pneumoconiosis, and that his pneumoconiosis arose out of employment in the Nation's coal mines. . . ." 20 C.F.R. § 410.410(b) (1979). *Robertson v. Califano*, 601 F.2d 1276, 1278 (4th Cir. 1979). There are several possible avenues of recovery for a miner who alleges he suffers from pneumoconiosis, the onset of which occurred prior to July 1, 1973. *See generally, Bozwich v. Mathews*, 558 F.2d 475 (8th Cir. 1977). The governing statutory provision, 30 U.S.C. § 921 (Supp.1979), sets forth three presumptions relevant to the present appeal. First, if a miner worked in the coal mines for ten years or more and he is suffering from pneumoconiosis, there is a rebuttable presumption that the disease arose out of that employment. 30 U.S.C. § 921(c)(1); 20 C.F.R. § 410.456(a). Second, an irrebuttable presumption arises if an X-ray, biopsy, or autopsy, satisfies the criteria of section 921(c)(3); 20 C.F.R. § 410.418. Third, if a claimant has been

---

**3.** *Sharpless v. Califano*, 585 F.2d 664, 667 (4th Cir. 1978).

**4.** As provided in 20 C.F.R. § 410.412(a) (1979):

A miner shall be considered totally disabled due to pneumoconiosis if:

(1) His pneumoconiosis prevents him from engaging in gainful work in the immediate area of his residence requiring the skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time (that is, 'comparable and gainful work'; see §§ 410.424–410.426); and

(2) His impairment can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than 12 months.

employed in the underground coal mines for 15 years or more and a chest X-ray is negative as to the section 921(c)(3) requirements and "if other evidence [5] demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis . . . ." 30 U.S.C. § 921(c)(4); 20 C.F.R. § 410.414(b). Once the presumption arises, the Secretary may rebut it "only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine." Id.; see Petry v. Califano, 577 F.2d 860, 864 (4th Cir. 1978).

To implement these provisions, the Secretary promulgated two sets of regulatory standards, the interim and permanent criteria. The first set, the interim regulations, found in 20 C.F.R. § 410.490, was designed to achieve the prompt resolution of the large backlog of claims pending at the time of the passage of the Black Lung Act of 1972. Pursuant to these regulations a miner is presumed disabled if: an X-ray, biopsy or autopsy establishes pneumoconiosis in accordance with the § 410.428 requirements; or, in the case of a miner, employed in the coal mines for at least 15 years, ventilatory studies establish the presence of respiratory disease with values equal to or less than the values in the § 410.490(b)(1)(ii) table. See generally, Sharpless v. Califano, 585 F.2d 664, 666 (4th Cir. 1978). When a miner has worked at least 10 years in the coal mines and satisfies § 410.490(b)(1)(ii), it will be presumed that his disability is attributable to his coal mine employment. § 410.-490(b)(3).

A miner who is unable to fulfill the requirements of the interim regulations may nonetheless have recourse under the permanent criteria found in 20 C.F.R. §§ 410.412 to .462. See 20 C.F.R. § 410.490(e). Of

particular interest here is § 410.414(b), the regulation interpreting the statutory presumption of 30 U.S.C. § 921(c)(4). It provides that if a miner has labored in the Nation's underground coal mines for 15 years or more and "if other evidence demonstrates the existence of a totally disabling chronic respiratory or pulmonary impairment . . ., it may be presumed, in the absence of evidence to the contrary . . ., that a miner is totally disabled due to pneumoconiosis . . . ." § 410.-414(b)(1), (3). As stated previously, the presumption can be rebutted only by evidence either that the miner is not suffering from pneumoconiosis or that the respiratory or pulmonary impairment is not attributable to his coal mine employment. Id. at (b)(2).

A review of the medical evidence in the present controversy may be summarized concisely. Of the numerous X-rays taken, 10 were read as negative while all of those initially interpreted to indicate respiratory impairment or pneumoconiosis, were reread as negative of disabling pneumoconiosis. All of the pulmonary function studies yielded values above the table values. Four blood gas studies were performed, two of which resulted in values designated in the Appendix to Subpart D as giving rise to the presumption of pneumoconiosis. These test results were achieved subsequent to June 30, 1973 and were separated by another blood gas study that produced figures which were not within the table values. Of the physicians that examined the claimant, only two, Dr. Odom and Dr. Buddington, believed him to be afflicted by pneumoconiosis. Dr. Odom's opinion was premised almost exclusively upon an X-ray which was reread as negative. Dr. Buddington's medical conclusion was based upon conflicting blood gas studies, a positive X-ray that was reread to be negative, a physical examination, and the claimant's medical history. Neither Dr. Odom nor Dr. Buddington was the claimant's treating physician.

---

5. Pursuant to 30 U.S.C. § 923(b) (Supp.1979), the Secretary, in evaluating all claims, is to consider all relevant evidence including, "medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits . . . . ."

■ We hold that the Secretary's decision that the X-rays did not establish pneumoconiosis was supported by substantial evidence. All X-rays that were interpreted as showing pneumoconiosis were reread as negative. With respect to the pulmonary function tests, none produced values equivalent or less than those specified in the interim regulations. Consequently, the presumption of disability never arose pursuant to the interim regulations, 20 C.F.R. § 410.-490(b).

The only alternative route of recovery remaining for the claimant is whether, pursuant to the permanent regulations, other evidence established pneumoconiosis or a chronic respiratory or pulmonary impairment. The resolution of that issue is largely dependent upon the weight to be given the conflicting blood gas studies. Again, the studies of October 1974 and December 1976 yielded results deemed presumptive of total disability while the study of December 1975 did not. Thus our analysis must commence with whether the Secretary correctly declined to apply the doctrine of relation back to the February 1976 medical report of Dr. Buddington. Depending upon the outcome of that determination, our next task is to determine whether the Secretary's decision, that the relevant evidence submitted by the claimant was inadequate to constitute a prima facie case of disability prior to July 1, 1973, was supported by substantial evidence.

■ Because pneumoconiosis is a progressive disease, courts permit, pursuant to the concept of relation back, the introduction of evidence subsequent to June 30, 1973 if it is relevant to the issue of whether the onset of the disability was prior to July 1, 1973.[6] In ascertaining whether evidence acquired subsequent to June 30, 1973 is indicative of pneumoconiosis prior to that date, courts must commence their analysis with the medical fact that pneumoconiosis is a degenerative disease. Medical opinion and medical mathematical probabilities are influential insofar as they relate the evidence back prior to the cutoff date. *See Begley v. Mathews,* 544 F.2d 1345, 1354 (6th Cir. 1976), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1684, 52 L.Ed.2d 380 (1977). The more recent the medical evidence, the less probative it becomes.[7] Similarly, a conflict between the evidence which is inconsistent with the progressive nature of the disease also would lessen the persuasiveness of the evidence.[8]

■ With regard to the probability that pneumoconiosis existed prior to the cutoff date, all reasonable doubts should be resolved in favor of the claimant. The Tenth Circuit adopted this position in *Paluso v. Mathews,* 573 F.2d 4 (1978) and held:

> We believe that the matter of "probability" should be further refined so as to encompass a presumption that a claimant who filed for benefits before the cut-off date is to be regarded as a "good faith"

6. *See Doss v. Califano,* 598 F.2d 419, 421–22 (5th Cir. 1979); *Johnson v. Califano,* 585 F.2d 89, 91 (4th Cir. 1978); *Hubbard v. Califano,* 582 F.2d 319, 321, n. 2 (4th Cir. 1978); *Paluso v. Mathews,* 573 F.2d 4, 10 (10th Cir. 1978); *Humphreville v. Mathews,* 560 F.2d 347, 349–50 (8th Cir. 1977); *Ingram v. Califano,* 547 F.2d 904, 908 (5th Cir. 1977); *Begley v. Mathews,* 544 F.2d 1345, 1353–54 (6th Cir. 1976), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1684, 52 L.Ed.2d 380 (1977). There are several reasons why it is imperative that the relation back doctrine be applied carefully and correctly. It was Congress' intent that the government assume responsibility only for claims in which the pneumoconiosis arose on or before June 30, 1973. After December 31, 1973, the financial burden was shifted to the state workmen's compensation systems or to the private employers. Also, because disability is determined in accordance with the Secretary's regulations, the authority of which is premised upon the jurisdictional deadline, the Secretary would exceed its Congressional authorization if it awarded benefits for claims arising subsequent to the cutoff date. Perhaps most importantly, the legislative history of the Act indicates that this date was a product of compromise between the Senate and the House. *See Ingram v. Califano,* 547 F.2d at 906–07.

7. *See Doss v. Califano,* 598 F.2d 419, 421 (5th Cir. 1979); *Back v. Califano,* 593 F.2d 758, 762–63 (6th Cir. 1979) (X-ray evidence from January 1975 and June 1975 was too tentative and too far removed from June 30, 1973, to entitle the claimant to benefits).

8. *Doss v. Califano,* 598 F.2d at 421–22.

claimant and that *if medical evidence acquired after June 30, 1973, can be construed to lead to a diagnosis that a miner probably was suffering from the disease on or before June 30*, all reasonable doubts that he was so disabled are to be resolved in favor of the claimant. We are of the view that all reasonable inferences and presumptions should be construed in favor of a miner who when he filed his claim believed that he was suffering from black lung, even though he had not mustered sufficient evidence of his disability prior to the cut-off date. We anchor this approach to a variety of factors, including a claimant's ignorance or misunderstanding of eligibility standards, lack of adequate medical evidence due to the progressive nature of black lung disease, a miner's financial inability to seek proper medical confirmation, and inexact methods of diagnosis. It is a matter of overriding importance that the Act is remedial in nature and is to be given liberal construction. (Emphasis added).

*Id.* at 10.

However, as the emphasized portion of the passage indicates, for any doubts to be resolved in favor of the claimant, the medical evidence must be susceptible to the construction that the claimant probably was suffering from a disabling respiratory impairment as of June 30, 1973. The case of *Doss v. Califano*, 598 F.2d 419 (5th Cir. 1979), is instructive. In *Doss*, the claimant argued that a positive X-ray reading of April 1975 entitled him to the presumption of 20 C.F.R. § 490(b)(1)(i). A November 1974 X-ray had been interpreted as negative. To permit recovery, the court recognized that the evidence must relate back to the cutoff date. Moreover, while post-June 30, 1973 evidence must be considered and evaluated, the court held that such evidence does not have to be given the same weight as pre-June 30, 1973 evidence. In resolving the conflict in evidence in favor of the Secretary's denial, the court explained its reasoning in the following language:

While it is clear that, for instance, an August 1973 X-ray would reflect a claimant's condition on July 1, 1973, the more distant in time an X-ray is from the cutoff date, the less probative it is of the claimant's condition at that time. Since medical evidence indicates that pneumoconiosis is a progressive disease . . . it is reasonable for the Secretary to conclude that the evidence did not relate back nearly two years.

[Furthermore], *the relation back concept is generally used to fill in gaps in the evidence*. Here the record includes a negative X-ray reading in November 1974. Again, since pneumoconiosis is progressive, to relate the April 1975 positive reading before the November 1974 negative reading would require that the 1974 report be discredited. A claimant cannot logically have pneumoconiosis in June 1973 and not have pneumoconiosis in November 1974. (Emphasis added).

*Id.* at 421–22.

The problem here is what effect is to be given the December 1975 blood gas study which conflicts with earlier and later blood gas studies. Were we faced with a situation in which a post-June 30, 1973 blood gas study, conducted soon after the cutoff date and uncontradicted by other evidence, produced results within the regulatory table, our task would be easier. Unfortunately, our situation is otherwise. Here there are no gaps in the evidence, only conflicts.

When the administrative law judge first decided the case in January 1976, he had before him the two blood gas studies of October 1974 and December 1975. At that time, he resolved the conflict by viewing the earlier results as indicative of a temporary condition. Later, when the Appeals Council examined the case, as supplemented by Dr. Buddington's February 1976 examination and blood gas study and by Dr. Montgomery's medical analysis, it concurred with Dr. Montgomery that the evidence failed to demonstrate the existence of pneumoconiosis on or before June 30, 1973. Due to the progressive nature of pneumoconiosis, the court deemed the conflicting blood gas studies inconsistent with the ex-

istence of pneumoconiosis as of June 30, 1973.

Conflicts among medical evidence are to be resolved by the Secretary.[9] Once the Secretary has considered the post-June 30, 1973 evidence and has reevaluated the evidence as a whole, her decision will be upheld so long as it is supported by substantial evidence [10] and is not "arbitrary, unreasonable, or an abuse of discretion." *See, e.g.,* Hill v. Califano, *592 F.2d 341, 346 (6th Cir. 1979);* Barnes v. Mathews, *562 F.2d 278, 279 (4th Cir. 1977).* *"It is not the task of a reviewing court to reweigh the evidence [but rather to determine] whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"* Vintson v. Califano, *592 F.2d 1353, 1357–58 (5th Cir. 1979).*

Here, exercising her prerogative to resolve evidentiary conflicts, the Secretary, when faced with conflicting test results, elected to adopt the reasoned opinion of the medical consultant.[11] Although two of the blood gas studies were below the table criteria, the significance of the results was diminished by the intervening test of December 1975.[12] That test was not challenged by the claimant. The December 1975 test, therefore, was an obstacle to the application of the doctrine of relation back to the February 1976 results. Due to the progressive nature of pneumoconiosis, it is medically unlikely that a test conducted prior to February 1976 would produce higher results than the February 1976 test. Such an occurrence does not suggest that the claimant was not suffering from pneumoconiosis in February 1976 but rather that the pneumoconiosis did not arise prior to July 1, 1973.[13] The claimant was afforded

9. *Doss v. Califano,* 598 F.2d 419, 422 (5th Cir. 1979).

10. *See Shrader v. Califano,* 608 F.2d 114, 116 (4th Cir. 1979); *Sharpless v. Califano,* 585 F.2d 664, 667 (4th Cir. 1978); *Gastineau v. Mathews,* 577 F.2d 356, 358–59 (6th Cir. 1978).

11. Whenever a consulting doctor is requested to review and to comment upon medical evidence it is imperative that he explain in detail, not conclusory terms, why he deems the test results to be nonpersuasive evidence of respiratory disease. Unlike the consulting physician in *Shrader v. Califano,* 608 F.2d 114, 116–18 (4th Cir. 1979) and *Johnson v. Califano,* 585 F.2d 89, 90–91 (4th Cir. 1978), Dr. Montgomery set forth his reasons for rejecting the conclusion that the impairment existed prior to June 30, 1973. Furthermore, it is clear that the Secretary considered and weighed Dr. Montgomery's report in conjunction with the conflicting evidence. *See Jordan v. Califano,* 582 F.2d 1333, 1335–36 (4th Cir. 1978). Nothing precludes the Secretary's consultants from discounting the findings of an examining physician so long as their findings are reasonable and have an evidentiary basis. *See Shrader v. Califano,* 608 F.2d at 118, n.4; *Stump v. Mathews,* 442 F.Supp. 457, 461–63 (D.Del.1977).

12. Recently, in *Barnette v. Califano,* 585 F.2d 698, 699 (4th Cir. 1978), we had occasion to review the evidentiary treatment given conflicting pulmonary function tests. There, three tests were given, the first yielded values below the table criteria while the two later tests resulted in scores exceeding the table standards. The Secretary had concluded that these tests, because of the chronological conflict, failed to establish the rebuttable presumption of total disability. Finding the Secretary's decision to be supported by substantial evidence, we affirmed.

13. Our decision in *Shrader v. Califano,* 608 F.2d 114 (4th Cir. 1979) should be distinguished from our conclusion here. In *Shrader,* the controversy focused on three pulmonary function studies: the first was given in January 1971 and yielded results equal to or less than the table values; in April 1972, a second test resulted in values exceeding the table criteria; and, a third set, in June 1974 produced scores equal to or less than the table values. The Secretary instructed two consulting doctors to reevaluate the two tests which meet the table criteria. The doctor reviewing the first test found fault with one aspect of the test administration yet failed to support his conclusion while the other medical consultant criticized the method of computation used in the last test. Based on these reports, the Secretary elected to discount their probativeness of pneumoconiosis or respiratory impairment. We held that the Secretary erred because both consultative reports were defective. The first was purely conclusional; the second, even if one accepted the validity of the computational error, when the "proper" method was substituted, yielded results within the table values. *Id.* at 118. As contrasted to this case, that decision was based upon the inadequacy of the consulting physicians' reports. Here there is nothing to indicate that the consulting doctor's report suffered from similar infirmities. Also worthy of note, is that relation back was not a pivotal issue in

the opportunity to respond to the conflicting studies and Dr. Montgomery's report, yet, declined to do so.[14] We also mention that Dr. Buddington was *not* the claimant's treating physician.[15] This factor also may have influenced the Secretary when weighing the evidence.[16]

■■■■ Having concluded that the last blood gas study did not relate back prior to July 1, 1973, we must now examine the evidence remaining to determine whether the Secretary's decision, that "other evidence" did not establish that the claimant was totally disabled because of pulmonary or respiratory impairment, was supported by substantial evidence. Although the lay testimony substantiated the claimant's case, the other evidence did not. All of the pulmonary function tests were above the table criteria. However, we recognize that even though the results of the pulmonary function tests did not equal or exceed the regulatory criteria, they nonetheless may constitute "other" evidence of chronic respiratory impairment. *See Ohler v. Secretary of H.E.W.*, 583 F.2d 501, 504 (10th Cir. 1978); *Hubbard v. Califano*, 582 F.2d 319, 321–23 (4th Cir. 1978); *Goss v. Califano*, 439 F.Supp. 3, 6 (W.D.Va.1977). Obviously the closer the values are to the tables, the stronger evidence they are of disability. Moreover, X-rays or ventilatory function tests that are insufficient to establish entitlement to benefits pursuant to the regulatory criteria, do not give rise to an inference that the claimant is not disabled nor, if the claimant makes a prima facie case of total disability, are they sufficient to show that the claimant was not entitled to the presumption. *Hubbard v. Califano*, 582 F.2d 319, 322 n.6 (4th Cir. 1978); *Bozwich v. Mathews*, 558 F.2d 475, 479–80 (8th Cir. 1977); *Henson v. Weinberger*, 548 F.2d 695, 699 (7th Cir. 1977); *Blankenship v. Califano*, 457 F.Supp. 973, 979 (N.D.Ill.1978); *Matney v. Califano*, 444 F.Supp. 165, 167–68 (W.D.Va.1978). They are simply other evidence to be evaluated by the trier of fact who may make negative inferences from them in conjunction with other medical evidence. *See Hubbard v. Califano*, 596 F.2d 623, 626 n.2 (4th Cir. 1979). *See also Henson v. Weinberger*, 548 F.2d 695, 698–99 (7th Cir. 1977) (testimony of treating physician and the claimant was sufficient to make out a prima facie case of disability pursuant to § 410.414(b)).

Cognizant of these legal guidelines, we nonetheless must affirm. Other than the lay testimony, the other evidence adduced

---

that case. One test was taken prior to the cutoff date and the other was taken one year afterwards. All of Mr. Prater's blood gas studies were taken subsequent to the cutoff date.

We also note, with interest, that submitted for our review was the September 1978 medical reports of Dr. John G. Byers, Jr. These reports were not before the Appeals Council. Dr. Byers' diagnosis was that the claimant had "x-ray changes consistent with chronic interstitial fibrosis with some early honeycombing at the bases, the latter being a nonspecific finding in interstitial lung disease." A blood gas study produced values of a $PO_2$ of 72, a $PCO_2$ of 35, which were *not* within the table criteria.

**14.** While we recognize that the testimony of a consulting doctor cannot provide the sole basis for denying a claim for black lung benefits, in a case, such as this one, in which other evidence exists to support the consultant's opinion, we are unable to hold that the Secretary erred in denying benefits. *Petry v. Califano*, 577 F.2d 860 (4th Cir. 1978) should be contrasted with this appeal. In *Petry*, the consulting doctor's report and normal pulmonary function tests were the only evidence supporting the Secre-

tary's position. Blood gas studies, although not meeting the Appendix criteria, a lung scan, the claimant's testimony, physician examinations by three doctors, and a report by a consulting doctor, all supported the claimant's contention that he was totally disabled because of a respiratory or pulmonary impairment.

**15.** As we stated in *Hubbard v. Califano*, 582 F.2d 319, 323 (4th Cir. 1978):

"This court places great reliance on a claimant's treating physician . . . especially where the Secretary neither has the claimant examined nor medically rebuts the tests upon which claimant's physicians rely."

Here, Dr. Buddington was not the claimant's physician, and the evidence was conflicting and inconsistent with the progressive nature of pneumoconiosis.

**16.** *See generally Henson v. Weinberger*, 548 F.2d 695 (7th Cir. 1977) (testimony of claimant and that of physician who had treated him since 1958 was sufficient to make out a prima facie case of disability).

was inadequate to prove, by a preponderance of the evidence, that the claimant was disabled because of respiratory or pulmonary impairment. Every pulmonary function test did not meet the table values; the *last* test, administered in July 1972, was interpreted as indicating *normal* breathing capacity. Similarly, the remaining medical evidence did not show the existence of respiratory or pulmonary impairment. The Secretary's decision was supported by substantial evidence. We consequently affirm.

*AFFIRMED.*